CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 0 7 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

JOHN E. LONEWOLF, )
)
Plaintiff, ) Civil Action No. 5:18cv00004
v. )
)
SGT. STEVE GARRETT, ) By: Hon. Michael F. Urbanski
) Chief United States District Judge
Defendant )

## MEMORANDUM OPINION

Pending in this case are Defendant Steve Garrett's motions for sanctions, for summary judgment, and to deem the requests for admissions admitted. ECF Nos. 26, 28, 50. Plaintiff John Lonewolf has responded and a hearing was held in the matter on April 10, 2019. As discussed more fully below, the court (1) denies the motion for summary judgment because of the existence of disputed issues of material fact; (2) grants the motion for sanctions to the extent that any evidence requested and not provided will not be admitted at trial; (3) awards monetary sanctions; and (4) grants in part and denies in part the request to deem the admissions admitted.

## BACKGROUND

### I.  Plaintiff's Allegations

Lonewolf filed this lawsuit on January 5, 2018, alleging deliberate indifference to his health and safety by defendants Steve Garrett and John Higgins. Plaintiff entered Rockbridge Regional Jail ("Rockbridge") on October 30, 2012 to serve a sentence for a drug offense. He

had been convicted in 1991 of aggravated sexual assault of a child and was required to register as a sex offender.

Lonewolf was processed into custody by defendant Garrett, who used Lonewolf's birth name of Earl William Giger. When Lonewolf protested that he had changed his name to John Earl Lonewolf in April 2012, Garrett became angry and refused to use Lonewolf's new name. Lonewolf asserts that Garrett, in the presence of two "Trusty" inmates, stated that Lonewolf was a sex offender.

Lonewolf protested that he was afraid for his safety because the "Trusty" inmates overheard Garrett mention his sex offender status and asked that Garrett not place him in general population. Garrett refused the request, stating that Lonewolf had been incarcerated in the Rockbridge general population before without any problems.

Lonewolf was assigned to the same cell block as Joel Copper. In July 2010, while incarcerated at Rockbridge, Copper had viciously assaulted inmate Fabian Schlegel because he believed Schlegel was a child rapist. Defendant Garrett's wife, also an employee at Rockbridge, witnessed the assault and filed a report.

Copper asserts he told defendant Garrett in August 2012 that he did not want to be housed with a child sexual offender because of his violent reaction to them. Three days before Lonewolf was transferred to Rockbridge, Copper asked that a presumed child sex offender be moved and again told defendant Garrett of his violent disposition towards them.

Within hours of Lonewolf being processed into Rockbridge, Copper learned of Lonewolf's sex offender history from other inmates. Shortly after 8:00 p.m., Copper entered

2

Lonewolf's cell and brutally assaulted him. During the assault, Copper called Lonewolf by the name "Hinger," "Hanger," or "Giger," and accused him of being a child sex offender.

At approximately 9:50 p.m., guards on duty, including defendant Garrett's wife, discovered Lonewolf barely conscious in his cell. He told them that Copper had beaten him and he was transported to the hospital emergency department. Lonewolf suffered multiple injuries to his left eye, left ocular ridge, left parietal skull, mandible, palate, spleen, two ribs, left lung, and intestines. He was hospitalized from the date of the assault, October 30, 2012, until February 2013. Lonewolf claims ongoing physical and mental injuries.

## II. Procedural History

Lonewolf initially filed this action on October 31, 2013 and the parties consented to the magistrate judge's jurisdiction on February 24, 2014. See Lonewolf v. Garrett, No. 7:13-CV-00519 (W.D. Va. 2017) (the "first suit"). Following a motion for summary judgment and an evidentiary hearing on the motion, United States Magistrate Judge Robert Ballou entered an order granting summary judgment on the claims against Higgins and denying summary judgment as to Garrett.

At the evidentiary hearing in the first suit, Copper admitted to beating Lonewolf after finding out he had been convicted of sexually assaulting a child. Copper corroborated Lonewolf's version of events, including beating inmate Schlegel in 2010, asking Garrett not to house him around child sex offenders, having Garrett imply to him that Lonewolf was a child sex offender, having other inmates confirm Lonewolf's conviction, and beating Lonewolf.

3

Garrett, Lonewolf, Higgins, and Candice Bane, a major at Rockbridge, also testified at the hearing.

Shortly before the trial date, Garrett filed a motion for sanctions asking to exclude certain evidence because Lonewolf had not responded to discovery requests. Lonewolf then voluntarily dismissed the lawsuit without prejudice via joint stipulation dated July 6, 2017. He filed the instant action on January 5, 2018, within the six-month period allowed by Va. Code § 8.01-229(E)(3).

Defendants Garrett and Higgins filed a motion to dismiss in this current suit on May 5, 2018, to which Lonewolf did not respond. A hearing was held on June 26, 2018. The court dismissed the claims against Higgins on res judicata and collateral estoppel grounds, and dismissed claims against the defendants in their official capacities. The case was set for trial against Garrett in his individual capacity.

The new suit was set for trial on March 3-4, 2019. Lonewolf again stonewalled discovery, leading Garrett to file a motion for sanctions and motion for summary judgment on December 19, 2018.

On January 7, 2019, a stipulation of dismissal with prejudice, signed by counsel for both Lonewolf and Garrett, was filed. Lonewolf contacted the clerk on January 11, 2019 by telephone, stating that he did not agree to the stipulation of dismissal. The court attempted a conference call on the issue on January 18, 2019, but Lonewolf did not join the call. The court then set a show cause hearing for January 24, 2019 in open court to address the stipulation of dismissal with prejudice.

4

Lonewolf and his counsel testified at the January 24, 2019 hearing, and the court determined to vacate the stipulation of dismissal with prejudice, based on a misunderstanding between Lonewolf and his counsel. The court set new deadlines to respond to the motion for sanctions and summary judgment and provide responses to the requests for admissions. The parties appeared and argued the present motions on April 10, 2019.

## DISCUSSION

### III. Motion for Sanctions

Rule 37(d) of the Federal Rules of Civil Procedure provides that a court may sanction a party for failure to respond to requests for discovery. Sanctions may include directing that the matters embraced in the discovery or other designated facts be taken as established for purposes of the action as the prevailing party claims; prohibiting the non-responsive party from supporting or opposing designated claims or defenses, or from introducing designated matters into evidence; striking pleadings in whole or in part; staying further proceedings until the order is obeyed; dismissing the action in whole or in part; or rendering a default judgment against the non-responsive party. Fed. R. Civ. P. 37(b) and (d). In addition, if a party fails to provide Rule 26 disclosures, including the identification of witnesses, the party is not allowed to use that information or witnesses to supply evidence at subsequent proceedings, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c).

Garrett filed a motion for sanctions on December 19, 2018, alleging that Lonewolf never provided answers to the first set of interrogatories and failed to provide his Rule 26 disclosures. Garrett asks that the case be dismissed, or, in the alternative, that all evidence

5

requested but not produced be excluded. After the motion for sanctions was filed, Lonewolf responded at least in part to the request for admissions, requests for production, and interrogatories.

Where dismissal is a potential sanction, courts have more narrow discretion because "the district court's desire to enforce its discovery orders is confronted head-on by the party's rights to a trial by jury and a fair day in court."[1] Mutual Federal Sav. And Loan Ass'n v. Richards & Associates, Inc., 872 F.2d 88, 92 (4th Cir. 1989) (citing Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 503-04 (4th Cir. 1977)). In deciding a motion for sanctions, courts use a four-part test: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. Wilson, 561 F.2d at 503-506. The test ensures "only the most flagrant case, where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules, will result in the extreme sanction of dismissal or judgment by default." Mutual Federal Sav., 872 F.2d at 92.

---

[1] No discovery order was entered in this case, but Rule 37(d) provides that the same sanctions that are available for not obeying a discovery order are available for failure of a party to attend its own deposition or respond to discovery requests. See Jackson v. Nissan Motor Corp., 888 F.2d 1391 at *4 (6th Cir. 1989) (unpublished) (noting that Rule 37(d) allows court to avail itself of sanctions otherwise available for contempt orders).

6

**(A) Bad Faith**

Bad faith includes willful conduct, where a party clearly understands its duty to the court but nevertheless deliberately disregards it. Opportunities Dev. Group, LLC v. Andruss, No. 1:14-cv-62, 2015 WL 2089841 at * 6 (E.D. Va. 2015). For example, in Belk v. Charlotte-Mecklenburg Bd. Of Educ., 269 F.3d 305, 348 (4th Cir. 2001), the Fourth Circuit found ample evidence of bad faith when a party was told to supplement its answers to interrogatories when such information became known, but failed to do so. As an excuse for untimely disclosure of fact witnesses, the party relied on the district court's pretrial order that parties were to provide a witness list to the court on the first day of trial. The district court found that the provision of the pretrial order was clearly for the convenience of the court and could not reasonably have been interpreted to apply to disclosures to the other parties.

Lonewolf argues that he did not act in bad faith because he did eventually respond and has not sought to frustrate this litigation or the discovery process, and, except for medical records, the vast majority of what he tendered to Garrett was information already in Garrett's possession. Garrett points out that Lonewolf was silent after being served with discovery requests and was silent in response to the motion for sanctions and motion for summary judgment until the court ordered him to respond.

The court finds evidence of bad faith on Lonewolf's part in failing to respond to the discovery requests and only doing so after he faced the threat of sanctions. However, he did provide the discovery in response to the threat of sanctions and has since complied with this

7

court's orders, appeared at scheduled hearings, and has not otherwise frustrated the proceedings.

**(B) Prejudice**

The rules of discovery are designed to prevent prejudice due to inadequate trial preparation rather than simply to punish obduracy. Wilson, 561 F.2d at 504, n. 23. A court must consider how the absence of the unproduced evidence impairs the other party's ability to establish its case and whether the non-complying party's conduct deprives the other party of a fair trial. Id. at 505. In addition, wasted time and attorney's fees have been found to be "a substantial amount of prejudice." Viswanathan v. Scotland County Bd. Of Educ., 165 F.R.D. 50, 53 (M.D.N.C. 1995).

Garrett has shown prejudice in that he had to file the motion for sanctions and attend a hearing. However, his ability to defend this lawsuit has not been impaired by the late filing of the discovery because most of the information revealed in discovery was the subject of testimony at the evidentiary hearing in the first suit.

**(C) Deterrence**

The Supreme Court held in Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976), that severe sanctions provided by statute or rule must be available to district courts in appropriate cases, not only to penalize those whose conduct may be deemed to warrant a severe sanction, but also to deter those who might be tempted to engage in such conduct in the absence of such a deterrent. Lonewolf concedes that although there is some history of noncompliance in this case and the first case, he has taken steps to respond to

8

discovery. He claims that he has not disregarded court orders to tender discovery or hold depositions and has heeded all warnings by the court which carry an express or implicit threat of dismissal.

Garrett points out that Lonewolf wholly failed to respond to discovery requests in the first suit and dismissed the lawsuit rather than face discovery sanctions. Lonewolf did much the same in this case, and only responded to motions and the requests for admissions when staring down dismissal with prejudice. Plainly, Lonewolf's discovery intransigence is undeterred.

**(D) Effectiveness of Less Drastic Actions**

Lonewolf asserts that after the last hearing he provided answers to discovery requests. Garrett counters that the responses were late and incomplete and that as of February 25, 2019, Lonewolf had failed to provide the names of witnesses; evidence regarding injuries and damages; evidence of Garrett's alleged acts or omissions supporting Lonewolf's claims; evidence refuting Garrett's affirmative defenses; and evidence from or regarding other inmates who were present when he was processed into the prison. Given that an evidentiary hearing was held in this case, that Lonewolf has provided some discovery and that discovery is now closed, the court does not find that a drastic action such as dismissal of the lawsuit is warranted.

In addition to consideration of the four Wilson factors, Lonewolf argues that the discovery violations are minor, and that Garrett will not be prejudiced by Lonewolf being allowed to present what evidence he can muster to prove his claim. He argues that the delay

9

in the response to discovery has been cured and that the discovery responses are consistent with the pleadings and other testimony.

Having considered the evidence, argument of the parties, the rules, and the relevant case law, the court **GRANTS** the motion for sanctions and orders the following sanctions:

### (1) Evidentiary Sanctions

Lonewolf will not be permitted to call any witnesses or present any evidence which has not been provided in discovery or introduced at the evidentiary hearing in the first suit.

### (2) Monetary Sanctions

Garrett has been prejudiced by having to expend time and effort and incur attorneys' fees and costs to obtain responses to his discovery, move for sanctions, and attend court hearings. Garrett is directed to provide an affidavit or declaration as to the attorneys' fees and costs incurred by Lonewolf's discovery intransigence, which, if reasonable and adequately supported, will be awarded.

### IV. Motion to Deem Requests for Admissions Admitted

Garrett argues that because the requests for admission were answered after the 30-day deadline for answering, they should be deemed admitted. Lonewolf did not respond to the motion but did present argument at the April 10, 2019 hearing.

Garrett served the first request for admissions to Lonewolf on October 26, 2018. Lonewolf failed to respond and on December 19, 2018 Garrett filed his motion for sanctions and motion for summary judgment. Following the hearing held on January 24, 2019, Lonewolf responded to the request for admissions on February 7, 2019.

10

Requests for admission are deemed admitted 30 days after being served on a party, unless the answering party serves a written answer or objection addressed to the matter. A shorter or longer time may be stipulated to by the parties or ordered by the court. Fed. R. Civ. P. 36(a)(3). A matter admitted is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Fed. R. Civ. P. 36(b); Adventis, Inc., v. Consolidated Property Holdings, Inc., 124 Fed. Appx. 169, 173 (4th Cir. 2005). A court may permit withdrawal or amendment of an admission if it would promote the presentation of the merits of the action and if would not prejudice the requesting party in maintaining or defending the action on the merits. Fed. R. Civ. P. 36(b).

A court cannot <u>sua</u> <u>sponte</u> withdraw a party's admissions. <u>Id.</u> at 173. However, under compelling circumstances, a district court may allow untimely replies to serve as the equivalent of a motion to withdraw or amend a response and the amendment may be allowed when the opposing party suffered no prejudice by the amendment. <u>Metpath, Inc. v. Modern Medicine</u>, 934 F.2d 319 at *2 (4th Cir. 1991) (unpublished) (citing <u>Gutting v. Falstaff Brewing Corp.</u>, 710 F.2d 1309, 1313 (8th Cir. 1983); <u>Moosman v. Joseph P. Blitz, Inc.</u>, 358 F.2d 686, 688 (2d Cir. 1966) and <u>French v. United States</u>, 416 F.2d 1149, 1152 (9th Cir. 1968)). For purposes of Rule 36(b), "prejudice results where a party faces difficulty in proving its case because of a 'sudden need to obtain evidence required to prove the matter that had been admitted.'" <u>Kelly v. Equifax, Inc.</u>, No. 8:12-CV-03095, 2013 WL 5954799 at *4 (D.S.C. 2013) (quoting <u>Metpath</u>, 934 F.2d at *2). In <u>Acosta v. Mezcal, Inc.</u>, No. JKB-17-0931, 2018 WL 4188448 at *5 (D. Md. 2018), the district court commented that reliance on admissions in crafting a summary

11

judgment motion does not describe prejudice significant enough to deny withdrawal of an admission. But see Trust v. Prestige Anapolis, LLC, No. 16-00544, 2017 WL 3085680 at *5-6 (D. Md. 2017) (finding that late admissions were deemed admitted for purposes of summary judgment because the requesting party had spent considerable time and effort crafting its motion for partial summary judgment and relied in part on the unanswered admissions and also because the late-responding party had the opportunity to see how the other party used the request for admissions in support of its summary judgment arguments).

Here, Lonewolf has presented no circumstances, much less compelling ones, on which the court could find that his late responses should serve as a motion to withdraw or amend his responses. Garrett alleges prejudice in that he relied on the deemed admissions in preparing his motion for summary judgment and because discovery in this case is now closed, he cannot engage in additional discovery related to the matters which are the subject of the admissions. Also, Lonewolf used the unanswered requests for admissions to put together his response to the motion for summary judgment. See ECF No. 39 at 7. Such factors weigh in favor of deeming the admissions admitted.

On the other hand, this case is in an unusual procedural posture with regard to the admissions because of the evidentiary hearing held in the first suit. It is clear from the testimony at the evidentiary hearing that Lonewolf does not agree with many of the contested factual assertions set out in the admissions, such as whether Garrett knew about Copper's prior assault of a sex offender or whether "Trustys" were in the area when Lonewolf and Garrett were discussing Lonewolf's name and sex offender history.

12

In addition, this case once again is at the summary judgment stage and "[c]ourts are particularly responsive to allowing late answers to requests for admission when summary judgment is involved…. It does not further the interests of justice to automatically determine the issues of a lawsuit and enter summary judgment against a party because a deadline is missed." Donovan v. Porter, 584 F.Supp. 202, 208 (D. Md. 1984) (internal citations omitted). See also Town & Country Properties, Inc. v. Howell, 892 F.2d 1042 at *2 (4th Cir. 1989) (unpublished) (finding district court did not abuse its discretion when it permitted defendants to respond to requests for admissions eight days after they were due and the opposing party failed to show any material prejudice from the delay); Acosta, 2018 WL 4188448 at *3 ("The truth-finding function of the federal courts is of paramount importance and this Court is reluctant to allow the rigid operation of procedural rules to supplant merits-based dispositions"); and Kelly, 2013 WL 5954799 at *3 (allowing untimely answers is discretionary and appropriate when doing so would facilitate the resolution of the case on the merits).

In this case, the court finds that it is appropriate to allow Lonewolf to withdraw his admissions and substitute his new answers only to the extent they are consistent with the prior evidentiary hearing testimony. It would be inequitable and inconsistent with the truth-seeking function of the court not to allow late responses to requests for admission where those responses parrot Lonewolf's evidence at the prior evidentiary hearing. Nor would there be any prejudice to Garrett to allow Lonewolf to present evidence consistent with that presented at the May 10, 2015 evidentiary hearing. Where the late responses to the request for admissions contradict or seek to add information not presented at the summary judgment hearing, they

13

are prejudicial to Garrett now that discovery has closed. As such, those responses will not be allowed.

In other words, Lonewolf's motion for leave to file late responses to the overdue Requests for Admissions is **DENIED** except to the extent that allowing a late response to a request to stand would plainly contradict evidence introduced at the May 10, 2015 hearing. It would not be in the interests of justice or prejudice Garrett to deny Lonewolf the opportunity to present the evidence introduced at the May 10, 2015 hearing.

Therefore, the following Requests for Admission are deemed admitted: 1, 2, 3, 4, 6, 9, 14, 15, 16, and 17. Specifically, these requests are admitted because Lonewolf's late responses either (a) admit the request: Requests for Admission 6, 15, and 16; (b) contradict his prior sworn testimony: Requests for Admission 1 and 2; or (c) are based on additional facts not introduced or subjects not covered at the May 10, 2015 hearings: Requests for Admission 3, 4, 9, 14, and 17.

Late responses are permitted as to Requests for Admission 5, 7, 8, 10, 11, 12, and 13 because the subject of these admissions were addressed at the May 10, 2015 evidentiary hearing, and to allow these requests to be deemed admitted by default would thwart, rather than facilitate, the merits-based resolution of the dispute.

## V. Motion for Summary Judgment

### (A) Summary Judgment Standard

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

14

as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with … [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)).

15

Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

**(B) Deliberate Indifference**

The Eighth Amendment imposes a duty on prison officials to "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). To establish a §1983 claim for failure to protect an inmate from violence, the inmate must show: (1) that the deprivation alleged is sufficiently serious and resulted in a denial of the minimal civilized measure of life's necessities and (2) that the prison official had a sufficiently culpable state of mind. Id. at 834 (internal quotation marks omitted). A "sufficiently culpable state of mind" means that a prison official "must both be aware of facts from which the inference

16

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

A showing of negligence is not sufficient. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, does not describe an Eighth Amendment claim. Farmer, 511 U.S. at 838. Stated differently, prison officials are not liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. Id. at 844; see Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (stating that it was insufficient to show that a defendant "should have" recognized a substantial risk of harm).

In Danser v. Stansberry, 772 F.3d 340 (4th Cir. 2014), the Fourth Circuit vacated a district court's order finding a dispute of material facts and denying qualified immunity in a failure to protect case. Danser, a convicted sex offender, told Boyd, a guard, that he wanted to go to the outside recreation cage. Boyd assigned groups of inmates to each recreation cage based on inmates' custody levels, the location of the inmates' cells in the facility, and data in a computer-generated Special Housing Unit ("SHU") Report.

Boyd placed Danser in an outside recreation cage with three other inmates, one of whom was Scott Gustin, a prison gang member. Danser and Gustin had not met before Boyd placed them in the same recreation cage, and there were no separation orders requiring that Danser and Gustin be kept apart from each other. Nor did the SHU report mention that Danser was a sex offender or that Gustin was in a gang. Boyd could have discovered that information had he looked in other prison databases, but he did not.

17

Instead of supervising the recreation cages as required by his position, Boyd left his post, and Gustin attacked Danser and beat him severely while uttering obscenities and commenting on Danser's sex-offender status. Id. at 344. Danser suffered significant injuries.

Danser sued under 42 U.S.C. § 1983, arguing that Boyd was deliberately indifferent to a substantial risk of harm. Boyd argued to the district court that he did not have a culpable state of mind because "he was not aware of any facts suggesting that Gustin posed a particular threat to Danser." Id. at 347. The court ruled in Danser's favor and set the matter for trial, primarily because Boyd assigned Danser, a convicted sex offender, to the same recreation cage as Gustin, who was a known violent gang member, and because Danser's injuries occurred when Boyd left the area unsupervised.

The Court of Appeals reversed, noting that the record failed to show as a matter of law that Boyd knew and disregarded an excessive risk to Danser's health or safety by leaving Danser and Gustin together in the unsupervised recreation cage. Id. at 348. The court rejected Danser's argument that it was obvious that placing Danser in a recreation cage with the assailant and leaving the area unsupervised would have led to an attack. Id. at 348-49. "To establish that a risk is 'obvious' in this legal context, a plaintiff generally is required to show that the defendant 'had been exposed to information concerning risk and thus must have known about it.'" Id. (quoting Farmer, 511 U.S. at 842). The Fourth Circuit concluded that "[o]n this record, there is no evidence that Boyd was exposed to such information." Id.

In Odom v. South Carolina Department of Corrections, 349 F.3d 765 (4th Cir. 2003), the Fourth Circuit reversed a district court's grant of summary judgment to correctional

18

officers on the question of deliberate indifference. The prisoner, Odom, told correctional officers of his fear of particular inmates, and the officers saw the inmates threaten Odom, attempt to break into Odom's cell, and goad others to attack Odom. Various staff members told the officers to move Odom to safety, but the officers allowed the inmates to attack Odom and said Odom got what he deserved for being a snitch. Id. at 771. The court found that Odom's uncontradicted sworn statements were sufficient to show that defendants were aware of the risk of harm and simply ignored it. Id.

Similarly, in Leary v. Livingston County, 528 F.3d 438 (6th Cir. 2008), the Sixth Circuit affirmed the district court's denial of a correctional officer's motion for summary judgment because the record established deliberate indifference. The officer told the detainee to not discuss his pending criminal charge for allegedly raping a nine-year-old girl because another inmate might attack him for it and then subsequently told other inmates about the detainee's alleged sex offense. The court found that the officer was aware of facts from which the inference could be drawn that a substantial risk of harm existed and drew the inference. He then did nothing to protect the detainee from a substantial risk of harm. Id. at 442.

The factual basis for Garrett's motion for summary judgment[2] lies in stark contrast to Lonewolf's assertions. Garret states that he processed Lonewolf into the jail on October 30, 2012 at approximately 10:38 a.m. Garrett was aware of Lonewolf's 1992 sexual assault conviction and asked him if he wanted to be placed in segregation. Lonewolf declined and

---

[2] Garrett's motion for summary judgment is based on the affidavit Garrett filed in the first suit, the deemed admissions (some of which, as discussed above, have been withdrawn), and portions of the testimony at the evidentiary hearing.

asked to be placed in the general population. Lonewolf previously had been placed in the general population without incident. When Lonewolf was being processed, there were no other inmates in the area who could have overheard their discussion.

Garrett assigned Lonewolf to Block 525 in general population but did not escort him to his cell and had no further contact with him. The guards who walked Lonewolf to his cell did not make any statements to the inmates, other than to say, "We have you another roommate." Garrett's decision to place Lonewolf in general population was approved by his supervisor and was consistent with his training and experience. Jail records did not indicate that Copper had assaulted sex offenders on two prior occasions, and Garrett had no knowledge of the prior assaults at the time he processed Lonewolf into the jail. In addition, Garrett did not process Copper into the jail on August 18, 2012.

Garrett disclaims any knowledge that Copper had previously assaulted a child sex offender at Rockbridge, although there is no apparent dispute that Copper had previously beaten a child sex offender at Rockbridge. Garrett did not remember the incident when he was processing Lonewolf into the jail. Garrett was familiar enough with Copper to know that he had been at Rockbridge several times.

Garrett's averments serve to highlight the factual disputes in this case. He stated that he had no knowledge that Copper would likely assault Lonewolf, in contrast to Copper's testimony that Garrett booked him into the jail and that Copper repeatedly asked Garrett not to house him with any child sex offenders. Garrett disputes that he booked Copper into jail and submitted evidence that he was not the booking officer.

20

Garrett disputes Copper's claim that he had multiple conversations with Garrett while incarcerated in Rockbridge and "made it very clear" to Garrett that he did not want to be housed with child sexual offenders. Indeed, Copper asserts that three days prior to Lonewolf being booked into the jail, an inmate with "crazy charges" was placed in housing with Copper, who testified that he told Garrett, "Look man, you got to get me out of here or get him out of here." Copper claims he told Garrett that he did not care if they put him in segregation, but he did not want to be housed with "people like that."

Although contradicted by Garrett's testimony, Copper testified that Garrett escorted Lonewolf to the cell block and said, "I got one for you-all" and laughed as he put him in the cell. Copper asserts that Garrett's comment raised suspicions and inmates made calls outside of the jail and learned of Lonewolf's prior convictions. When Copper learned this information, he went into Lonewolf's cell to ask him about it, and subsequently beat him.

At this stage, the court is not permitted to weigh the credibility of Lonewolf, Copper, and Garrett, and must construe the disputed facts in the light most favorable to Lonewolf, the non-moving party. Given that Garrett, Copper, and Lonewolf tell very different stories about the circumstances leading to Lonewolf's beating, genuine issues of material fact exist that must be resolved by a jury.

In particular, if Lonewolf and Copper are believed, their testimony is sufficient to show that Garrett had a "'sufficiently culpable state of mind,' namely that he 'kn[ew] of and disregard[ed] an excessive risk to [Lonewolf's] health or safety'" when he assigned Lonewolf to the same cell block as Copper. See Danser, 772 F.3d at 348 (quoting Farmer, 511 U.S.at

21

834, 837). In <u>Danser</u>, the record failed to show as a matter of law that the guard appreciated that his act of leaving Danser and the assailant together in an unsupervised area created an excessive risk to Danser's safety. Here, testimony from Lonewolf and Copper create a fact question on that issue.[3]

Considering the evidence in the light most favorable to Lonewolf, a genuine issue of material fact exists as to whether Garrett knew housing Lonewolf near Copper posed an excessive risk to Lonewolf's safety and disregarded that risk. Accordingly, the court is not permitted to grant summary judgment to Garrett on Lonewolf's Eighth Amendment claim.

### (C) Qualified Immunity

Garrett argues that even if the court finds that Lonewolf alleged a constitutional violation, Garrett still is entitled to qualified immunity. The doctrine of qualified immunity affords protection against individual liability for civil damages to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Stated another way, "[q]ualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" <u>Booker v. South Carolina Dept.</u>

---

[3] Even without the issue of whether the "Trusty" inmates overheard the conversation, a jury could find on these facts that Garrett appreciated the danger to Lonewolf and took no steps to alleviate it. <u>See</u> <u>Danser</u>, 772 F.3d at 348 (finding that a risk, is "obvious" if the defendant has been exposed to information concerning the risk and thus must have known about it.) In <u>Danser</u>, the Fourth Circuit pointed out that there was no evidence in the record that the defendant knew that the plaintiff was a sex offender or that the assailant was a gang member. <u>Id.</u> at 347. Here, it is uncontested that Garrett knew about Lonewolf's status and a fact issue exists regarding Garrett's knowledge of Copper's violent history and animosity toward sex offenders.

of Corrections, 855 F.3d 533, 537-538 (4th Cir. 2017) (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). "[A]lthough a plaintiff may prove that an officer has violated certain constitutional rights, the officer nonetheless is entitled to qualified immunity if a reasonable person in the officer's position 'could have failed to appreciate that his conduct would violate those rights.'" Meyers v. Baltimore County, Md., 713 F.3d 723, 731 (4th Cir. 2013) (quoting Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991)). The doctrine weighs the need to hold public officials accountable for irresponsible exercise of power against the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly. Booker, 855 F.3d at 538 (citing Pearson, 555 U.S at 231).

In performing a qualified immunity analysis, a court must first determine the specific right that the plaintiff alleges was infringed by the challenged conduct. Id. (citing Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). The court then must ask whether a constitutional violation occurred and whether the right violated was clearly established at the time the official violated it. The questions need not be asked in a particular order. Id. (citing Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010) and Pearson, 555 U.S. at 236). The plaintiff bears the burden of showing that a constitutional violation occurred, while the defendant bears the burden of showing entitlement to qualified immunity. Henry v. Purnell, 501 F.3d 374, 377-378 (4th Cir. 2007).

Again, at this point, the facts are in dispute as to whether a constitutional violation occurred. Garrett asserts that there were no other inmates within earshot of the discussion about Lonewolf's sex offender status and that he lacked awareness of Copper's violent

23

proclivities. Lonewolf claims other inmates overheard him being booked by Garrett and learned he was a child sex offender. Lonewolf also claims that Garrett was aware that Copper posed a risk to child sex offenders.

In determining whether a right is clearly established, a court must define the right allegedly violated at the appropriate level of specificity. Odom, 349 F.3d at 773 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). This analysis does not contemplate that the exact conduct at issue has been held unlawful, but takes into consideration not only already specifically adjudicated rights, but also those included within more general applications of the constitutional principle invoked. Id. (internal citations omitted).

The question in this case becomes whether it was clearly established in 2012 that an officer's decision to house a convicted sex offender, whose history was discovered at the institution, with an inmate who told the officer that he presented a threat to the offender, constituted deliberate indifference to the offender's Eighth Amendment rights. The court finds that this right was clearly established.

It is well established that "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S at 833. In 2010 the Fourth Circuit found that a plaintiff stated a claim for deliberate indifference when he alleged that an officer told him to enter an area of the prison knowing that another inmate in the area harbored a grudge against the plaintiff and when the plaintiff did so, the other inmate attacked him. Brown v. North Carolina Dept. of Corrections, 612 F.3d 720 (4th Cir. 2010). Similarly, in 1987, the Fourth Circuit found that an inmate stated a claim when he alleged that he told prison officials

24

that he wanted to be separated from inmates who had threatened him, was placed in the same dormitory as the inmates, and was attacked by one of them the same night. Pressly v. Hutto, 816 F.2d 977 (4th Cir. 1987). See also Wilson v. Wright, 998 F.Supp. 650, 657 (E.D. Va. 1998) ("[a] prison official incurs Eighth Amendment liability if he or she in making a cell assignment knows of, and is deliberately indifferent to, a substantial risk of serious harm one inmate generally poses to any assigned cellmate.")

The court finds that it was well established in 2012 that the duty to protect inmates from violence at the hands of other inmates included making housing decisions based on a known risk that an inmate posed to other inmates placed in his housing area. The conflict in the evidence precludes the court from granting Garrett's qualified immunity defense at this stage of the litigation.

## CONCLUSION

The court **GRANTS** the motion for sanctions, ECF No. 26, to the extent that any evidence requested from Lonewolf but not produced as of the date of this order will not be admitted at trial. If Lonewolf has failed to identify witnesses, the only witnesses who will be allowed to testify are those who testified at the summary judgment hearing held in the first suit: John Lonewolf, Steve Garrett, John Higgins, Joel Copper, and Candice Bane. The court also awards monetary sanctions in an amount to be determined following submission by defendant as to the amount of costs and fees expended due to Lonewolf's discovery intransigence.

The court **GRANTS in part and DENIES in part** the motion to deem the admissions admitted, ECF No. 50. Requests for Admission 1, 2, 3, 4, 6, 9, 14, 15, 16, and 17 will be deemed admitted. Requests for Admission 5, 7, 8, 10, 11, 12, and 13 are not deemed admitted, and the responses sent to Garrett on February 7, 2019 are considered timely responses to those few requests for admissions.

The court **DENIES** Garrett's motion for summary judgment, ECF No. 28, finding that genuine issues of material fact require the case to be presented to a jury.

It is so **ORDERED**.

Entered: 05-07-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge